# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

UNITED STATES OF AMERICA,    )
   )
       Plaintiff,    )
   )
   v.    )    Case No. 05-4391-CV-C-NKL
   )
THE STATE OF MISSOURI    )
   )
     and    )
   )
ROBIN CARNAHAN,    )
MISSOURI SECRETARY OF STATE,    )
in her official capacity.    )
   )
       Defendants.    )

## ORDER

Article I, Section 4, of the United States Constitution provides that "[t]he Times,

Places and Manner of holding Elections for Senators and Representatives, shall be

prescribed in each State by the Legislature thereof; but Congress may at any time by Law

make or alter such Regulations . . . ."  Pursuant to this Constitutional authority,[1] Congress

passed the National Voter Registration Act, which is generally referred to as the Motor

Voter Act.  *See* 42 U.S.C. §§ 1973gg-2 to 1973gg-9.

The NVRA requires each state to "conduct a general program" that makes a

---

[1] Presidential Elections are regulated by Article II, section 1, of the Constitution but the powers granted to Congress in Article I, section 4 are coextensive with the power of Congress to regulate presidential elections. *Burroughs v. United States,* 290 U.S. 534 (1934)

1

"reasonable effort" to remove from voter registration lists the names of voters who have become ineligible by reason of death or change of residence. *See* 42 U.S.C. § 1973gg-6(a)(4). The NVRA also directs each state to designate "a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under [the NVRA]." 42 U.S.C. § 1973gg-8. Missouri has designated the Secretary of State as the chief election official to coordinate its NVRA responsibilities. Mo. Rev. Stat. § 115.136(1).

The United States contends in this lawsuit that the State of Missouri and Robin Carnahan, Secretary of State ("Defendants"), have failed to comply with the voter registration list maintenance provisions of the NVRA. In its Complaint, the United States asks this Court to:

> (1) Declare that the Defendants are in violation of Section 8 of the NVRA by failing to conduct a general program of list maintenace that makes a reasonable effort to remove the names of ineligible voters.
> (2) Enjoin the Defendants from failing or refusing to comply with its list maintenance obligations.
> (3) Order the Defendants to take all steps necessary to remedy past violations of Section 8 of the NVRA
> (4) Order Defendants to provide the Court within 30 days a plan to remedy the demonstrated violations of Section 8 of the NVRA.

The parties have agreed that the case will be submitted to the Court on the written record.[2] Each party has been given an opportunity to identify the evidence that it wishes

---

[2] The record submitted by the parties is based on documents filed in support of their cross motions for summary judgments. Those motions were denied because the United States contends that the reasonableness of the Defendants' efforts to conduct NVRA list maintenance activities is a question of fact that precludes summary judgment. Therefore, in lieu of a hearing,

the Court to consider.  Missouri has filed a Motion to Strike Exhibit B which contains

evidence  submitted by the United States.  The Motion is denied and the Court will

consider that information when making its findings of fact.

## I.	Findings of Fact

### A.	Missouri's Local Election Authorities

Elections in Missouri are administered by 116 Local Election Authorities

(singularly, "LEA"), not by the Secretary of State.  Of the 116 LEAs, 114 are elected

county officials.  None of the 116 LEAs are employees of the Secretary of State's Office

nor do any of them answer to directives from that office.  At all relevant times prior to

January 1, 2006, the LEAs possessed the official lists of eligible voters.  Since January 1,

2006, the official voter registration lists have been in the possession of the Secretary of

State's Office.

### B.	Missouri's Efforts to Comply with the NVRA Before March 2005

#### 1.	Statutory Efforts

After Congress passed the NVRA, Missouri enacted HB 1411, which amended

Missouri's statutory scheme for voter registration and voter list maintenance such that

Missouri law is now consistent with the requirements of the NVRA.[3]  Missouri law

requires LEAs to do exactly what is required by the NVRA.

the parties agreed that the Court should make its Findings of Fact and Conclusions of Law based
on the current written record.

[3] For a more detailed account of HB 1411 and its provisions, see the Court's May 23,
2006 Order.

### 2. Additional Compliance Efforts

#### a. Technology

##### (1) Central Voter Registration Database

Prior to 1996, some local election authorities maintained voter registration information in hard copy only. Other local election authorities maintained computerized records, but the local election authorities' computer systems were not compatible with each other, thus making synchronization of all voter lists impossible.

In 1996 Missouri entered into a contract with Election Technology Company for the development of a state voter registration system. Under this contract, Missouri was to receive a Centralized Voter Registration Database ("CVRD"). Also, some local election authorities were to receive Local Voter Registration Systems ("LVRS"). The contract also called for the installation of hardware and software, data conversion and training, and maintenance and support for these computer systems. For those local election authorities that did not have a computer, the Missouri legislature appropriated funds to purchase a computer and a printer. The Secretary of State managed the CVRD; the respective LEA managed its LVRS.

From 1996 to 2004, each LVRS was to be updated either weekly or monthly. These updates were to be transmitted by the LEAs to the CVRD at the Secretary of State's Office. During this time period, the Secretary of State's Office also received information from the Missouri Circuit Courts as to the identity of individuals adjudged incapacitated or convicted of a felony. This information was compared to that in the

4

CVRD and if the Secretary of State's Office found a voter registrant that appeared to match a felon's name, the information was sent to the appropriate LEA. If no match was found, the information was forwarded to the LEA in that jurisdiction where the felony was adjudicated unless an address for the felon was available. Then the report was sent to the LEA where the felon lived.

As for deceased voters, the Registrar of Vital Statistics is required to send a list of names and addresses of deceased people over the age of 18 to the LEA in the jurisdiction where the decedent lived. This information is also posted on the Secretary of State's extranet site and was continually available for LEAs to check.

Prior to 2004, the CVRD also prepared a quarterly report for LEAs which identified potential duplicate registrations in their jurisdiction. This information was sent to the LEAs and after 2004, this information was also posted on the Secretary of State's extranet site so that LEAs could access the information at any time.

In total, Missouri spent more than six million dollars to purchase, support and maintain the Central Voter Registration Database in the Secretary of State's Office and the Local Voter Registration Systems in the Office of the LEAs.

(2)    <strong>Missouri Voter Registration System</strong>

In 2004, the Secretary of State began a process that would eventually replace the CVRD with the Missouri Voter Registration System ("MVRS"). The MVRS is a single voter registration database that is available from the Secretary of State's extranet connection. The new MVRS came on-line in January 2006. The MVRS flags potential

5

duplicate registrants as an LEA enters new registrant information into the system. In addition, state felony information is added into the MVRS. The MVRS updates nightly its report of potential duplicates and state felonies.[4] These reports are always available to the LEAs. The MVRS also regularly updates the reports from the Bureau of Vital Statistics which show recent deaths of voter age Missourians.

At the time the record in this case closed, the MVRS was not fully implemented. When it is, individual data bases will no longer be maintained by the LEAs. Nonetheless, the LEAs will still be required to send accurate information to the Secretary of State.

**b.    Training**

In addition to technological improvements, the Secretary of State's Office has presented several training programs on the NVRA to local election authorities at various seminars across Missouri. The Secretary of State's Office has also created several publications related to the requirements of the NVRA and some of those materials are posted on the Secretary of State's extranet website.

On several occasions, Missouri, through the Secretary of State's Office or its contractor for the CVRD and LVRS, provided training and support services to LEAs designed to instruct the LEAs on the list maintenance requirements of the NVRA and Missouri law. Support services were also made available to the LEAs by telephone.

---

[4] Federal felony convictions are not electronically reported to the Secretary of State's Office by the federal government. Therefore, federal felony information is distributed to the LEAs by mail.

6

In 1996, Missouri provided training to LEAs on the following days: Februrary 29; March 1 and March 4-6; April 22-25 and April 29-May 2; May 6-9 and May 20-23; June 10-13 and June 24-28; July 15-19; August 26-29; and December 2-5 and December 9-13.

In 1997, Missouri provided training to LEAs on the following days: January 6-9, January 27-28, January 29-31; February 10-14, February 17-21, February 24-26, February 28; March 10, 12 and 14; April 14-16, April 18; June 23-27; September 3-5; and October 13-17.

In 1998, Missouri sent NVRA training materials to LEAs and held a training session on February 17, 1998.  Additional materials sent to the LEAs included: a letter from Missouri's contractor which discusses NVRA requirements and provides instruction on the proper method of performing NVRA confirmation mailings; a document titled "'Doing NVRA' with LEMS," which sets forth a time table for doing confirmation mailings; a document titled "Missouri Laws: Voter Canvass, ID Card and NVRA"; and a document titled "Guidelines for use of the Duplicate Registration Report Produced by the Centralized Voter Registration Database (CVRDB)."

In 1998 and 2002, which are election years for most LEAs, Missouri invited newly elected LEAs to its new clerk training program where the LEAs received instruction on the list maintenance requirements of the NVRA.

On January 13, 1999, Missouri again distributed a copy of the "Guidelines for Use of the Duplicate Registration Report."  Missouri conducted an additional training session on June 26-28, 2000.

Additional training sessions were held on September 13-14, 2001 and September 24-26, 2003. In 2004, the Secretary of State's Office posted on its extranet a document titled "Guidelines for the Use of Deceased Registrants Report Produced by the Department of Health and Matched by the Centralized Voter Registration Database (CVRDB)." Also in 2004, Missouri distributed a document titled "Voter ID & Canvass Flowchart" at an August 25-27 county clerks' meeting.

### C.     2005 Survey and County Clerk Affidavits

Pursuant to the Help America Vote Act, which was passed by Congress in 2002, the Secretary of State conducted a survey of Missouri's LEAs, which covered activities from 2002-2004. The March 2005 results of that survey were sent to the United States Election Assistance Commission (EAC). It appears that this is the first EAC survey required by federal law.[5]

The 2005 EAC survey reports that in approximately one-third of Missouri's counties, the number of registered voters exceeded the number of eligible voters set forth

_____

[5]The United States' Exhibit A-19 is not an EAC survey. Exhibit A-19 is a survey generated by LEAs using Local Election Management Software ("LEMS"). The survey in Exhibit A-19 does not include information from all Missouri counties because some county clerks reported the requested information in hard copy. When a county clerk sent a hard copy of the information to the Secretary of State, the LEMS system reported that the county conducted no list maintenance activities. Therefore, the information contained in the United States' Exhibit A-19 cannot be used to determine whether LEAs in Missouri were complying with the NVRA between 2000 and 2002. In addition, because the LEMS survey was obviously incomplete and inaccurate, the United States has failed to prove that the Secretary of State was on notice of list maintenance problems when the then Secretary of State received that survey.

8

in the recent census data.[6]  For example, in Reynolds County, the EAC survey reports that the ratio of registered voters to the voting age population reached a statewide high of 153%.  In both Reynolds and Pemiscot counties, the number of registered voters reported exceeded the total population.  However, after suit was filed by the United States, the Secretary of State contacted all LEAs who had reported on the 2005 EAC survey that their county had more registered voters than voting age population.  The Secretary of State determined that some of those LEAs over reported registered voters by including inactive voters twice.  Thus, the 2005 EAC does not accurately report which counties in Missouri actually had more registered voters than voting age population.  Nonetheless, it is conceded by the Defendants that some counties did have more registered voters than voting age population.[7]

The 2005 EAC survey also reports that 22 Missouri counties had low numbers of inactive registrants.  The Government claims that the low number of inactive voters in those counties indicates the LEA was not conducting routine maintenance of the voter lists as mandated by the NVRA.  The Government has not explained why the low

---

[6]The data contained in the 2005 survey is hearsay and, therefore, cannot be used to prove the truth of the information reported.  However, the survey is admissible to show that this information was reported by the LEAs and to show that, as of March 2005, the Secretary of State was on notice that some LEAs either did not know how to fill out the survey or had made entries that indicate the LEA may not have complied with the list maintenance requirements of the NVRA.

[7]The NVRA makes it inevitable that voter registration lists will be inflated because of its requirement that States wait to remove a voter's name who has not responded to an 8(d)(2) notice until that voter fails to vote in two successive federal elections.

Case 2:05-cv-04391-NKL   Document 103   Filed 04/13/07   Page 9 of 26

numbers indicate a failure to conduct required list maintenance.

There are also data that 12 Missouri counties have dropped more than 20% of their registered voters from active registration in a single nine-month period. The Government claims that this data indicates that these counties were not complying with the NVRA's dictates regarding removing voters from the active registration list. Again, the Government has not explained its conclusion or shown that any actual voters were improperly dropped.

The 2005 EAC survey also reports that 23 Missouri counties sent no 8(d)(2) Notices between 2000 and 2004. Another 15 counties answered this question "N/A" or left the item blank. These 38 rural counties contain 12% of the state's population. Similarly, the survey reports that four LEAs removed no voters from the rolls on account of death or responded "N/A" or left the item blank.

The other evidence in the record relevant to the issue of LEA compliance with the NVRA is contained in affidavits from the county clerks of Worth, Ralls, Gentry, Knox, Crawford, Miller and Reynolds counties. These county clerks signed declarations that they did not know when to send 8(d)(2) notices or when to place voters on the inactive list. Some of these clerks also confirmed that they reported no "deaths" or "felony" removals on the 2005 survey but added that their reports may have been erroneous in that regard.[8]

_____

[8]After the 2005 survey was sent to the EAC, the Secretary of State contacted each LEA in Missouri and sought a personal commitment to comply with the NVRA and relevant Missouri

**D.     Compliance Efforts After March 2005**

After the Secretary of State received the 2005 EAC survey, the Secretary of State

adopted an Action Plan to further educate the local election authority officials about the

NVRA and encourage compliance.  *See* Def. Ex. 1-X.  She also used the March 2005

survey to develop topics for further training.  According to the Action Plan, the Secretary

of State was to prepare a manual for local election authorities to help them conduct their

NVRA list maintenance activities.  The Action Plan also called for the Secretary of State

to continue its training sessions "at regular intervals" to educate local election authorities.

*Id.* at ¶ 2.  In addition to the manual and the continued training, the Action Plan provided

that the Secretary of State would "send notifications, in writing, to the local election

authorities to remind each local election authority of the requirements for NVRA

compliance."  *See* Def. Ex. 1-X at ¶ 3.

The Action Plan will also track list maintenance by local election authorities.

Paragraph 4 of the Action Plan states:

> During 2006, the State will develop a method of tracking list maintenance
> activities of the local election authorities.  This method will consist of
> tracking list maintenance activity conducted by local election authorities
> either through the statewide voter registration list itself or an appropriate
> external mechanism.

*Id.* at ¶ 4.  If these tracking activities uncover discrepancies or potential NVRA non-

statutes.  The county clerks of Camden, Knox and Reynolds counties indicated they would not
comply.  However, after further discussion with the Secretary of State's Office, they all agreed to
perform the mandated tasks.

11

compliance, the Secretary of State will contact the appropriate LEA and

> [I]dentify the list maintenance activities that appear to be inconsistent with
> NVRA. At a minimum, the notification process will consist of:
>
> • written notification detailing the maintenance activities that appear to
> be inconsistent with NVRA based on the tracking method;
>
> • a telephone call subsequent to the written notification to address any
> questions and to provide information regarding NVRA compliance;
>
> • written follow-up communication with the local election authorities
> to monitor progress; and
>
> • contact with the local election authority to request a meeting if there
> is no progress towards compliance with NVRA or if the [Secretary
> of State]'s office does not receive a response from the local election
> authority.

*Id.* at ¶ 5.

The Secretary of State will also use the MVRS database to monitor compliance

with the NVRA. If the Secretary of State discovers non-compliance, she will implement

the notification procedures in paragraph 5 of the Action Plan.

All actions required by the Action Plan were not completed before the record

closed in this case, but many were. In September 2005, the Secretary of State undertook

training for all of Missouri's 116 local election authorities. This training included a

review of list maintenance procedures required by the NVRA. *See* Def. Ex. 1-T. Shortly

thereafter, on November 9, 2005, Missouri reminded the LEAs of the requirement to

engage in list maintenance activities and distributed to them a revised Voter ID &

Canvass Flowchart. The Secretary of State concluded the training for all 116 LEAs

Case 2:05-cv-04391-NKL   Document 103   Filed 04/13/07   Page 12 of 26

before January 1, 2006.

LEAs regularly contact the Secretary of State's Office with questions concerning the NVRA and list maintenance requirements. In December 2005, Missouri established a Help Desk with a dedicated phone line and toll free number to field LEAs' calls.

In December 2005, Missouri conducted a telephone survey of each LEA to determine the LEAs' compliance with proper voter list maintenance procedures. Each LEA was asked to commit to the following: (1) perform a canvass of its registered voters during 2006; (2) send confirmation notices to those registrants for whom the canvass mailing is returned by the postal system or for whom the National Change of Address system indicated have moved from their voter registration address; (3) mark non-responding registrants as inactive and remove from the voter lists voters that remain classified as inactive and do not vote in the next two federal general elections; and (4) remove registered voters from the voter lists whom they can confirm have died, been convicted of a felony or have been adjudged incapacitated.

In February 2006, Missouri sent the NVRA Procedures Manual to all local election authorities. Also, Missouri trained LEAs on list maintenance requirements on May 17-19, 2006 and emailed the handouts from the training to all LEAs regardless of whether they attended the May 17-19 meeting. In addition, Missouri provided individualized training to individual LEAs at their request on at least fifteen different occasions during the first half of 2006.

On May 2, 2006 and July 14, 2006, Missouri sent a letter to selected LEAs who it

13

had reason to believe needed individualized reminders of their list maintenance responsibilities. The letter stated, in part, that "[b]ased on our MCVR monitoring and/or the EAC survey, your jurisdiction has more registered voters than voting age population based on the 2004 Census estimates or you show no list maintenance activities." *See* Def. Ex. 1-QQ. The letter, however, did not address what specific deficiency was found in a particular jurisdiction.

   **E.  Has a Reasonable Effort been made by the Secretary of State and State of Missouri to Conduct NVRA List Maintenance Activities?**

   According to the United States, the reasonableness of the Defendants' efforts to conduct NVRA list maintenance activities is a question of fact. Regardless of whether it is a question of fact or law, the Court finds under either analysis that the United States has not sustained its burden to show that the Defendants have violated the NVRA's mandate that Missouri "conduct a general program"[9] which makes a "reasonable effort" to remove from voter registration lists the names of voters who have become ineligible by reason of death or change of residence.

   The NVRA does not define "reasonable effort" and the Court has found no authority that describes the parameter of the terms. The United States concedes that "Congress did not prescribe a specific list of activities necessary to conduct or coordinate

---

   [9]The United States claims that Missouri's list maintenance program is not a general program because some LEAs are not complying. This issue is addressed in the Court's Conclusions of Law where it finds that the conduct of the LEAs cannot be imputed to the Defendants. *Also see Harkless v. Blackwell*, 467 F. Supp.2d 754 (N.D. Ohio 2006).

14

a general program that makes a 'reasonable effort' to perform the list maintenance requirements of NVRA, recognizing that the requisite steps will vary with each State's circumstances." [Pl's Opp. at 32.] Because the NVRA contains no definition of the term "reasonable effort," the Court will give it its ordinary meaning. "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42, 100 S. Ct. 311 (1979).

A reasonable effort is one based on reason and not improper purposes. The dictionary defines the term "reasonable" as "agreeable to reason"; "not extreme or excessive"; "possessing sound judgment." Webster's 7th New Collegiate Dictionary. The antonym for effort is "do-nothingness, ease, inaction, lackadaisicalness, laziness.." Roget's New Millennium Thesaurus First Edition (Vol. 3.1).

The United States contends that the Defendants have not made a reasonable effort to comply with the NVRA. The United States claims that the Defendants were indifferent and inattentive. The United States argues that to be in minimal compliance with the NVRA, the Defendants should:

1.  Monitor the list maintenance activities of the LEAs to determine if they are complying with the NVRA.

2.  Investigate survey entries or other evidence that suggests noncompliance with the NVRA.

3.  Contact LEAs who do not appear to be complying with the NVRA and

15

notify them of apparent deficiencies.

4.      Actively instruct and encourage LEAs to comply with the NVRA.  *See*
        United States' Motion for Summary Judgment at p. 43.

The United States further argues that the Court should give deference to the United

States' interpretation of Missouri's obligations pursuant to *Skidmore v. Swift & Co.*, 323

U.S. 134, 140 (1944).  In *Skidmore*, the Supreme Court held that, in applying the Fair

Labor Standards Act, the rulings of the Administrator were not controlling upon the

courts, but constitute a body of informed judgment to which a court may resort for

guidance.  The *Skidmore* court wrote, "[t]he weight of such a judgment in a particular

case will depend upon the thoroughness evident in its consideration, the validity of its

reasoning, its consistency with earlier and later pronouncements, and all those factors

which give it power to persuade, if lacking power to control."  *Id*.

In *United States v. Mead Corporation*, the Supreme Court described *Skidmore*

deference as follows:

> The fair measure of deference to an agency administering its own
> statute has been understood to vary with circumstances, and
> courts have looked to the degree of the agency's care, its
> consistency, formality, and relative expertness, and to the
> persuasiveness of the agency's position.  The approach has
> produced a spectrum of judicial responses, from great respect at
> one end, see, *e.g.*, *Aluminum Co. of America v. Central Lincoln
> Peoples' Util. Dist.*, 467 U.S. 380, 389-390, 104 S. Ct. 2472, 81
> L.Ed.2d 301 (1984) ("'substantial deference'" to administrative
> construction), to near indifference at the other, see, *e.g.*, *Bowen v.
> Georgetown Univ. Hospital*, 488 U.S. 204, 212-213, 109 S. Ct.
> 468, 102 L.Ed.2d 493 (1988) (interpretation advanced for the first
> time in a litigation brief).

16

533 U.S. 218, 228, 121 S. Ct. 2164 (2001) (some citations omitted).

In this case, the Government seems to have developed its interpretation of Missouri's obligations under the NVRA either in preparation for litigation or during the course of litigation. Furthermore, notwithstanding inevitable state-to-state variations, the Government has not shown that its position with respect to Missouri's obligations is consistent with its position as to any other state's obligations. As such, the Government's position will be afforded only as much deference as justified by the persuasive power of its argument. *See Landmark Legal Foundation v. I.R.S.*, 267 F.3d 1132, 1136 (D.C. Cir. 2001) (holding that I.R.S.'s interpretation of statute, which it developed in litigation, merited no more than the weight derived from its power to persuade).

### 1. Monitoring and Notification

The United States contends that the NVRA requires the Defendants to regularly monitor whether LEAs are complying with the NVRA and then notify the LEAs if they are not compliant. The NVRA, however, does not contain any monitoring requirement. Indeed, the Help America Vote Act ("HAVA"), adopted after the NVRA, only requires the States to submit a biennial survey to the United States Election Assistance Commission. HAVA was passed after widespread concerns were raised about the conduct of the United States elections, yet Congress included no specifics in the law regarding the States' obligation to monitor, other than requiring a survey. If Congress had intended an independent monitoring obligation, it would have said so with more specificity.

17

The NVRA does require the Defendants to make a reasonable effort to remove from voter registration lists the name of voters who become ineligible by reason of death or change of residence, but the State did this by passing a law mandating its LEAs to comply with the NVRA, providing resources and training for the LEAs, and giving local prosecuting attorneys the authority to prosecute LEAs for noncompliance. It is reasonable for the State to expect prosecuting attorneys to enforce the State requirements because they are in geographic proximity to the LEA and most likely to be aware of voting problems. Likewise, because the United States has the most interest in elections for federal office, it is reasonable for the State to expect the Department of Justice to pursue LEAs who are not complying with the NVRA.

This is particularly so because only the Department of Justice and the local prosecuting attorneys have the power to enforce the requirements of the NVRA and relevant Missouri statutes. The Court is unpersuaded that mere monitoring, as opposed to enforcement, would produce the results now demanded by the United States. For example, the United States has suggested that Missouri voter registration lists should never have more than 90% of Missouri's voting age population. Yet, the City of St. Louis has never had less than 93% of its voting age population, even though St. Louis has been under the supervision of the United States for some time and the United States has a consent decree against the City of St. Louis.

Independent elected officials, not answerable to the Secretary of State or other state officials, may or may not respond to the Secretary of State's entreaties. For

18

example, there is no evidence in the record that the country clerks in Knox, Reynolds, Crawford, Miller, Worth, Gentry and Ralls Counties are now in compliance with the NVRA, having learned of their deficiencies from the United States Government.  In fact, two of these county clerks, after telling the United States about their deficiencies, refused to even say they would comply with the NVRA when approached by the Missouri Secretary of State.  While they have now acquiesced, one might reasonably question their sincerity.

The Defendants' decision to allocate enforcement responsibilities to local prosecuting attorneys and the federal government is clearly based on reason and common sense, given the structure of Missouri government.  However, even if an independent monitoring obligation does exist, the current Secretary of State clearly made a reasonable effort to monitor LEAs once the 2005 survey showed potential problems.  In fact, the Secretary of State has done many of the things that the United States Government now seeks Court supervision to accomplish.  Given the equitable nature of the relief requested by the United States, the Court declines to order the Secretary of State to do things which she is already doing voluntarily.  To do otherwise would exhibit inadequate respect for federalism.

### 2. Threats and Financial Sanctions

The United States also suggests that reasonable efforts might have included financial incentives, threats of state takeover, publishing adverse publicity about the LEA or referring the LEA for prosecution by the Justice Department.  First, it is unclear to this

19

Court that any of the United States' proposed solutions would cause these LEAs to do a better job. They have been repeatedly instructed about the law. They have collectively been given millions of dollars in equipment. They have been trained on the process for accurately maintaining their lists. The only county clerks who have been identified by the Justice Department as actually violating the NVRA were not prosecuted by the Justice Department and the Court does not expect that adverse publicity from the state or federal government is going to have a significant impact on the politics of rural Missouri.[10] Instead, it seems reasonable that direct action against the offending LEAs is what is most likely to produce the results the United States seeks. That authority lies with the Department of Justice and local prosecuting attorneys, not the Defendants.

### 3.    The Defendants' Efforts have been Reasonable

The United States has identified LEAs who have failed to comply with the NVRA and concluded that the Defendants are at fault. However, the United States has not presented evidence showing how or why the LEAs failed in some Missouri jurisdictions and not others, so it is unclear how fault can be attributed to the Defendants. All these LEAs were provided a similar legislative mandate, training and resources, yet only some failed.

More importantly, the United States has not shown that other States have had more success than Missouri. Reasonableness assumes a norm, but the United States has not

---

[10]According to the survey, most of the problems identified by the United States are in rural Missouri.

produced any evidence of that norm. It has not submitted the EAC surveys from other States which demonstrate that Missouri's results are outside the norm. While the United States contends that Maine and Indiana are now model jurisdictions since agreeing to a consent decree, it has not presented evidence that there are no longer list maintenance problems in those jurisdictions. Furthermore, a consent decree is not evidence of remedial action required by the NVRA. Because parties consensually resolve a dispute does not mean the result is mandated by law. Finally, two states out of 50 does not establish a norm.

While there are list maintenance problems by some LEAs, the United States has not proven that the scope of the problem is as great as alleged. The Defendants have shown that some parts of the 2005 EAC survey were not accurate and some of the county clerks interviewed by the United States indicated their survey results were probably mistaken. Thus, it is difficult to tell from the record how extensive the problem is because the United States has not presented the actual voter registration lists and shown who should have been included or excluded and why.

It is also telling that the United States has not shown that any Missouri resident was denied his or her right to vote as a result of deficiencies alleged by the United States. Nor has the United States shown that any voter fraud has occurred. Increased voter participation and elimination of fraud were the primary goals of Congress when it mandated that the States make reasonable efforts to maintain accurate voter registration lists. The absence of evidence of fraud or voter suppression during the relevant time

21

period weighs heavily in favor of a finding that the Defendants' efforts have been reasonable.

Prior to the 2005 survey, the Defendants spent millions of Missouri dollars to provide the federal government with a mechanism for electing federal officials. While this is Missouri's obligation under the United States Constitution, surely substantial weight should be given to this expenditure of resources when evaluating the reasonableness of the Defendants' efforts to comply with the NVRA. The United States' contention that the Defendants were "indifferent or inattentive" is simply not supported by the record.

The essence of the United State's argument is that the Defendants' efforts are unreasonable because they have not been successful. Reasonableness, however is not a strict liability standard. It is a standard that contemplates latitude given the circumstances of each state. Recognizing the difficulties posed by Missouri's constitutional structure, the Secretary of State has sought to centralize the voter registration list through technology so it can voluntarily monitor whether the NVRA is being appropriately followed. Her office has responded to specific problems identified in the March 2005 survey and proposed or done many things that the United States contends are required by the NVRA.

Given the substantial efforts that were made by the State of Missouri, the lack of any evidence of bad faith, the difficulty that the Secretary of State faces when election authority is decentralized and the lack of any evidence that the remedies sought by the

United States would have eliminated the problems which it has identified, the Court firmly concludes that the State of Missouri and the Secretary of State have made a reasonable effort to conduct a general program of voter list maintenance as required by the NVRA.

Because the United States Constitution gives the States the initial authority to determine how federal elections are to be run, and that authority is curtailed only when the United States Congress so provides, it is not appropriate to read the NVRA expansively. If the United States wants to shift to the States more NVRA enforcement responsibilities, it should direct its request to Congress, not the courts.

## III.    Conclusions of Law

The United States has made three arguments to support its claim for declaratory and injunctive relief. First, it argues that the LEAs have not complied with the NVRA's list maintenance requirements. Second, it claims that the LEAs are state election officials and, therefore, when they violate the NVRA, the State of Missouri has violated the NVRA. Third, the Unites States argues that the Defendants have failed to make a reasonable effort to conduct and coordinate a general program to remove ineligible voters from its voter registration rolls.

The first and third arguments have already been addressed in this Order or the Court's Order of May 23, 2006. Thus, the remaining question is whether a NVRA violation by an LEA constitutes a violation of the NVRA by Defendant State of Missouri.

The United States argues that "the actions of county and local election officials *are*

23

the actions of Defendant the State of Missouri." [Plaintiff's Motion for Summary Judgment, p. 53 (emphasis in original).]  In support of this argument, the United States notes that Missouri counties are "legal subdivisions of the state."  Mo. Const. art. 6 § 1; *Baumli v. Howard County*, 660 S.W.2d 702, 704 (Mo. 1983) ("a county is but a subdivision of the state, created as a matter of administrative convenience").

To the extent the United States seeks a declaration that the State of Missouri has violated the NVRA because the LEAs have violated the NVRA, the United States has sued the wrong parties.  While Missouri counties are created by state law and are political subdivisions of the state of Missouri, they are not the State of Missouri.  When a prisoner seeks relief for some injustice done by a county sheriff, he or she must sue the county, not the State of Missouri.  Similarly, if sued, a county cannot claim Eleventh Amendment Sovereign Immunity.  *Gilliam v. City of Omaha*, 524 F.2d 1013 (8th Cir. 1975).  The LEAs and the county have the capacity to sue and be sued in their own name and they are the proper party under Federal Rule of Civil Procedure 17, if the Government wishes to enforce the NVRA against them.  While none of the cases or statutory provisions cited by the parties are directly on point, the weight of the authority by analogy demonstrates that the State of Missouri is not the proper party to sue when a specific local election official has violated a provision of the NVRA.  *See Harkless v. Blackwell*, 467 F. Supp.2d 754 (N.D. Ohio 2006).[11]

---

[11]This is not to say that a violation of NVRA by an LEA cannot be addressed.  They can be sued by the United States pursuant to authority found in the NVRA or by local prosecuting

24

To the extent the United States is attempting to impute the conduct of the LEAs to the State of Missouri, they have failed to explain how Missouri law or the NVRA permits the Defendant State of Missouri to be held directly responsible for the conduct of the LEAs. Under Missouri law, no statewide official can sue the LEAs to make them comply with the NVRA, so it would make no sense to conclude that the LEAs' conduct should be imputed to the Secretary of State or the State of Missouri.

As previously discussed in its Order of May 23, 2006, the Court finds that there is nothing in the NVRA to suggest that Congress intended to make the states restructure their governments to comply with the NVRA. The United States Constitution gives the States the right to set the time, place and manner of electing federal office holders and takes that right away only if Congress has said otherwise. Absent a clear directive from Congress, the default rule should apply and the State of Missouri should be able to continue its tradition of decentralized elections. While Congress may be able to amend the NVRA to require what the United States is effectively asking for, the Court finds that the current language and history of the NVRA does not support the United States' argument.

## IV.    Conclusion

Because the United States has failed to show by a preponderance of the evidence that the State of Missouri and the Missouri Secretary of State have violated the NVRA,

---

attorneys pursuant to Missouri law.

judgment is entered in favor of the Defendants.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: April 13, 2007
Jefferson City, Missouri